UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

P.A., JR., an infant minor,                          :
                                                     :
                              Plaintiff,             :     10-CV-04661(JG)(SMG)
                                                     :
             - against -                             :     **SECOND AMENDED**
                                                     :     **COMPLAINT**
CITY OF NEW YORK; JOHN MATTINGLY,                    :
individually and in his capacity as                  :     **JURY TRIAL DEMANDED**
Commissioner of the Administration for               :
Children's Services; DEBORAH PRIDE,                  :
individually and in her capacity as a Child          :
Protective Specialist for the Administration for     :
Children's Services; NATALIA ROSADO,                 :
individually and in her capacity as a Child          :
Protective Specialist for the Administration for     :
Children's Services; ROSA SOSA, individually         :
and in her capacity as a Child Protective            :
Specialist for the Administration for Children's     :
Services; ROBERT SALEMI, individually and            :
in his Capacity as a Supervisor of Child             :
Protective Specialists for the Administration for :
Children's Services; ZANETTE SARGEANT,               :
individually and in her capacity as a Child          :
Evaluation Specialist for the Administration for :
Children's Services; ST. VINCENT'S                   :
SERVICES, INC.; CARLINE ANDERSON,                    :
individually and in her capacity as a                :
caseworker for St. Vincent's Services, Inc.; and :
ZOILA VILLALTA, individually and in her              :
capacity as a supervisor of caseworkers for St. :
Vincent's Services, Inc.,                            :
                                                     :
                              Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

P.A., Jr., an infant minor ("P.A." or "Plaintiff"), by and through his undersigned

*pro bono* counsel, alleges on information and belief as follows:

## PARTIES

1.      Plaintiff P.A. is a minor child who was born on November 28, 2002, and resided in the City of New York at all relevant times prior to his disappearance.  P.A. is a citizen of the United States, and, therefore, is entitled to rights under the United States Constitution.

2.      Defendant City of New York (the "City") is a municipal corporation created and authorized under the laws of the State of New York.  The City is authorized by law to maintain and operate the Administration for Children's Services ("ACS") and to procure child protective services from private vendors.

3.      Defendant John Mattingly ("Mattingly") was at all times relevant hereto the Commissioner of ACS.  As Commissioner of ACS, Defendant Mattingly is a policymaker for the City, who is responsible for making and/or approving policies for ACS, including policies regarding the removal and detention of children from their families, the placement and maintenance of children in foster care, and the training and supervision of ACS employees.  As Commissioner of ACS, Defendant Mattingly is responsible for ACS's compliance with the Constitution, statutes, regulations, and common law of the United States and the State of New York.  At all times relevant hereto, Defendant Mattingly supervised all other Defendants.

4.      Defendants the City and Mattingly are responsible for strengthening families and protecting children, like P.A., and for training and supervising employees of ACS to achieve critical objectives to support families and prevent placement of children in foster care and, where foster care is needed, to maximize placement of children with family and within their own neighborhood.

5.      Defendant Deborah Pride ("Pride") was at all times relevant hereto a child protective specialist employed by the City through ACS.

2

6.     Defendant Natalia Rosado ("Rosado") was at all times relevant hereto a child protective specialist employed by the City through ACS.

7.     Defendant Rosa Sosa ("Sosa") was at all times relevant hereto a child protective specialist employed by the City through ACS.

8.     Defendant Robert Salemi ("Salemi") was at all times relevant hereto a supervisor of child protective specialists employed by the City through ACS, and at all times relevant hereto supervised Defendants Pride, Rosado and Sosa.

9.     Defendant Zanette Sargeant ("Sargeant") was at all times relevant hereto a child evaluation specialist employed by the City through ACS.  (Defendants Mattingly, Pride, Rosado, Rosa, Salemi and Sargeant are referred to herein as the "ACS Defendants").

10.     Defendant St. Vincent's Services, Inc. ("St. Vincent's") is a not-for-profit corporation authorized and existing under the laws of the State of New York having an address at 66 Boerum Place, Brooklyn, New York 11201.  St. Vincent's contracts with the City and the State of New York to provide child protective services and was at all times relevant hereto an "authorized agency" as defined in New York Social Services Law § 371.

11.     Defendant Carline Anderson ("Anderson") was at all times relevant hereto a caseworker employed by St. Vincent's.

12.     Defendant Zoila Villalta ("Villalta") was at all times relevant hereto a supervisor employed by St. Vincent's, and at all times relevant hereto supervised Defendant Anderson.  (Defendants St. Vincent's, Anderson, and Villalta are referred to herein as the "St. Vincent's Defendants," and together with the City and the ACS Defendants are collectively referred to herein as "Defendants").

13.     At all times relevant hereto, Defendants acted under color of state law.

14.     Non-party Librada Moran ("Moran") was at all times relevant hereto a natural person having an address at 130 Vandalia Avenue, 11B, Brooklyn, New York 11239.

15.     Non-party J.A., an infant minor, is the sister of P.A. (P.A. and J.A. are collectively referred to herein as the "Children").

16.     Non-party Jennifer Rodriguez ("Rodriguez") is the natural mother of the Children.

17.     Non-party Patrick Alford, Sr. ("Alford, Sr.") is the natural father of the Children.

## JURISDICTION AND VENUE

18.     As this is an action seeking redress for violations of Plaintiff's civil rights, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). Jurisdiction over Plaintiff's state-law claims is conferred upon this Court by 28 U.S.C. § 1367.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).

20.     Plaintiff demands a jury trial on each and every claim pleaded herein.

## FACTUAL BACKGROUND

### ACS Becomes Involved With P.A. and His Family

21.     In March 2009, Rodriguez sought help with the educational and mental-health needs of P.A. from Staten Island Mental Health Society ("SIMHS"), a not-for-profit "authorized agency" as defined in New York Social Services Law § 371, which contracted with the City through ACS to provide these services.

22.     Throughout 2009 and January 2010, SIMHS and ACS personnel were in regular contact with Rodriguez and P.A.

23.     During this time period, SIMHS and ACS regularly visited the Rodriguez home, sometimes unannounced, and always observed the Children to be healthy, clothed, well-

4

kept and otherwise suitably cared for in that home.

24.     As a result of their regular contact with P.A., the ACS Defendants and

SIMHS became aware of P.A.'s educational and mental-health needs, his participation in special

educational programs, and his typical behavior.

**Acting Under the Color of Law, ACS Improperly Seized P.A. From the**
**Custody of His Family Without Consent by Any Family Member and Forced**
**Him Into Foster Care by a Stranger Despite Available Adequate Family Resources**

25.     On or about December 29, 2009, Rodriguez telephoned Defendant Salemi,

an ACS supervisor, and informed him that she had been using illicit drugs.  Later that day,

Salemi dispatched two ACS child protective specialists ("ACS CP Specialists"), Defendants

Pride and Sosa, to Rodriguez's home located at 80 Van Buren Street, Staten Island, New York,

and ordered the ACS CP Specialists to remove the Children from the home immediately.

Following these orders, and acting under the color of law, Defendants Pride and Sosa physically

seized J.A. and removed her from the home and custody of her natural mother, Rodriguez,

without the consent of her mother or natural father.

26.     On December 29, 2009 and for some period beforehand, P.A. was safely

in the care and custody of Rodriguez's aunt, Blanca Toledo, in Brooklyn, New York.  The home

of Toledo was a safe and suitable environment for P.A., and Toledo consented to P.A. staying in

her home, and was ready, willing and able to continue caring for P.A.

27.     On or about December 29, 2009, upon learning P.A. was staying with his

aunt, without any investigation of whether P.A. was in any danger, Salemi instructed Defendants

Pride and Sosa to go to Toledo's home and seize P.A.  Acting under the color of law, Defendants

Pride and Sosa physically seized P.A. and removed him from the home and custody of his

familial aunt, Toledo, without her consent or the consent of his natural mother or father.

5

28.     ACS' removal of P.A. without consent of Rodriguez, Toledo or any other family member, was without a Court Order and in the absence of any emergency or exigent circumstances.

29.     Prior to seizing him, the ACS Defendants failed to make any determination that the circumstances or condition of P.A. indicated that continuing to remain in the home of Toledo, a family member, presented any emergency or imminent danger to P.A.'s life or health, or that any other basis existed to seize him and deprive P.A. of Toledo's custody, care and companionship.

30.     Before seizing P.A., the ACS Defendants never made any determination the Toledo home was unsuitable for P.A. or that Toledo was an unsuitable caregiver.  In fact, Toledo's home was suitable for P.A., as the ACS Defendants admitted after the removal.

31.     Before seizing P.A., as a result of its regular contact with P.A. and Rodriguez, the ACS Defendants knew that P.A.'s father, Alford, Sr. lived in New York, was actively involved in P.A.'s life and had previously cared for P.A. for several years.

32.     Before seizing P.A., the ACS Defendants never made any determination that Alford, Sr. was an unsuitable caregiver for P.A. or that his home was unsuitable for P.A.  In fact, Alford, Sr.'s home was suitable, as the ACS Defendants admitted when they paroled P.A.'s sister, J.A., into his custody.

33.     At no time prior to seizing P.A. did the ACS Defendants attempt to locate or contact Alford, Sr.

34.     At no time prior to seizing P.A. did the ACS Defendants inform Alford, Sr. that Rodriguez was not providing a safe and suitable environment for P.A. or J.A., that his Children were being seized or that they were going to be forced by ACS to live with a stranger in

foster care.

35.    On the evening of December 29, 2009, after removing P.A. from his aunt's care, ACS forced him and J.A. to spend the night in one of its facilities *incommunicado* from their family members.

## The Incomplete and Misleading Affidavit

36.    On or about December 30, 2009, the ACS Defendants caused a sworn statement to be submitted to the Family Court to justify the seizure of P.A. from the Toledo home.  The affidavit was materially misleading in at least the following respects:

(i)    Failing to disclose that P.A. was not in the custody of Rodriguez when he was seized.

(ii)   Failing to disclose that P.A. was under the supervision and custody of his aunt, Toledo, at her residence and that no determination had been made that this "other legally responsible person" did not provide a safe, sound and caring environment or that the situation posed an imminent danger to P.A.

(iii)  Falsely representing to the Court that "[the ACS Defendants] assessed the child to be in such circumstances that the child's continuing  . . . in the care and custody of the parent or other person legally responsible presented an imminent danger to the child's life and/or health if not immediately removed," when in truth and in fact P.A. was in no danger, imminent or otherwise, from continuing in his aunt's care.

(iv)   Falsely representing to the Court that the "[c]hild was in need of immediate protective action based upon assessment of imminent danger," when in truth and in fact the ACS Defendants made no assessment that the care, custody and supervision of P.A.'s aunt posed any danger.

(v)    Misleadingly representing that "reasonable efforts to prevent or eliminate the need" for the removal of P.A. occurred, when no reasonable efforts had been made, and P.A. should have been allowed to remain in the custody of his aunt.

## ACS Instructed St. Vincent's To Place P.A. Into Foster Care With a Non-Family Member and P.A. Was Consigned to the Care of a Non-English Speaking Foster Mother in a Neighborhood Far Away From P.A.'s Home

37.    On or about the morning of December 30, 2009, the City through ACS

instructed St. Vincent's to place P.A. into foster care with a non-family member.  In so doing, the City elected not to first investigate whether kinship resources or a family friend were available.

38.     The City, through ACS, failed to instruct its delegatee St. Vincent's to place P.A. with a foster care mother who lived in P.A.'s neighborhood or that spoke fluent English and with whom P.A. could effectively communicate.

39.     Defendants placed P.A. with Moran, a Spanish speaker who did not speak fluent English and lived in Brooklyn – far from P.A.'s neighborhood in Staten Island.  P.A. was an English speaker who did not speak fluent Spanish.

40.     Defendants knew or should have known that Moran did not speak fluent English and that P.A. did not speak fluent Spanish and would be unable to effectively communicate with Moran.

41.     Defendants knew or should have known that P.A. had special educational and mental-health needs and did not place him with a caregiver capable of meeting those needs.

**The Initial Child Safety Conference**

42.     Later on December 30, 2009, ACS held an Initial Child Safety Conference ("ICSC"), which was attended by ACS personnel, SIMHS personnel, the Children's parents and other family members.  The ICSC constitutes a policy of the City and Mattingly through which they purport to fulfill their legally mandated obligations relating to the placement of children under their jurisdiction.

43.     The City and Mattingly knew that the ICSC (which conference is outside of judicial purview) would involve critical decisions by ACS employees, acting under the color of the law, that would impact the Constitutional rights of children, and thus mandate "thorough examination" of "a family's strengths and needs" and an "assessment" of the safety and risk

8

factors which impact placement decisions.

44.     At the December 30, 2009 ICSC, Alford, Sr., Toledo and various other
family members volunteered to care for P.A.  Due to the lack of training, failure of supervision
and/or a customary practice to ignore family members, the ACS Defendants refused to allow P.A.
to be cared for by a family member, including his parent Alford, Sr. or his maternal aunt Toledo
from whose care and custody he had been wrongfully seized.  Acting under the color of law, the
ACS Defendants refused to release the Children to their family and continued to force them to
remain in its custody.  To this end, the ACS Defendants adopted a misnomered "safety plan" that
required P.A. to be segregated from all family members and remain in the foster care of Moran
while the ACS Defendants investigated the appropriateness of kinship resources.  Shockingly,
pursuant to the City and Mattingly's policy whereby ACS will not revisit or review foster care
placement decisions for a period of at least 20 days after the ICSC (the "20-Day Policy"), this
"plan" was not scheduled for review until January 28, 2010, nearly a month after P.A. was seized.

**To All Defendants' Knowledge, P.A. Immediately and Significantly Deteriorated,
Exhibiting Signs of Extreme Distress and Routinely Attempting to Run Away**

45.     On or about January 4, 2010, Defendant Anderson, a caseworker at St.
Vincent's, was assigned to P.A.'s case.  Anderson was at all relevant times supervised by
Defendant Villalta.

46.     From Anderson's first contact with Moran, she became aware that P.A.'s
ill-conceived placement with Moran was causing him extreme emotional distress.

47.     On or about January 5, 2010, after P.A. had been in Moran's care for less
than one week, Anderson was advised by Moran that P.A. was acting in an extreme manner that
was very atypical for a child of his age.  More specifically, Moran explained that P.A. was
repeatedly asking to leave and return to the care of his family, physically attacking other children

9

in the foster home (including his own sister), exhibiting hyperactive behavior, lying and complaining of headaches.

48.     On or about January 6, 2010, Anderson made her first visit to P.A. at Moran's home. Anderson had barely entered the apartment before P.A. began asking if Anderson was going to take him and his sister home. Throughout the remainder of the visit, P.A. made repeated inquiries about leaving Moran's custody and returning home, stating that "he could not take it any more."

49.     On or about January 7, 2010, Moran again informed Anderson by phone of P.A.'s extremely difficult and atypical behavior.

**The January 8, 2010 Supervised Visit – P.A.'s  Repeated Attempts To Escape**

50.     On or about January 8, 2010, St. Vincent's hosted a supervised visit in the presence of Defendant Anderson between the Children, Rodriguez, Toledo, and others.

51.     Over the course of the two hour visit, P.A. repeatedly attempted to escape from St. Vincent's, even leaving the visiting room where he and the family members were meeting and attempting to leave the building altogether. In one instance, Anderson had to physically restrain P.A. to keep him from leaving the building. Even though Anderson reminded P.A. that his mother was in the visiting room, P.A. stated that he did not care and continued to attempt to evade Anderson and leave the building. Eventually, Rodriguez intervened and brought P.A. back to the visiting room. After he returned to the visiting room, P.A. continued attempting to escape St. Vincent's by running past Anderson, who was guarding the door.

52.     At the end of the visit, P.A. attempted to leave with Rodriguez and again had to be physically restrained by Anderson. P.A. begged Anderson to let him leave with his mother.

53.     After Rodriguez left St. Vincent's, P.A. stood on the window sill trying to break the window and subsequently attempted to throw a chair through the window.  P.A. also attempted to overturn a heavy table and then made repeated attempts to escape from the room.

54.     After being moved to a different room, P.A.'s distress continued unabated. He climbed up the window sill to the ceiling of the room in an attempt to escape and later climbed on top of a desk trying to reach the ceiling to escape through an opening in the ceiling tiles.  P.A.'s multiple escape attempts lasted for a considerable amount of time.

55.     Anderson later admitted that her primary focus throughout the January 8, 2010 meeting and immediately thereafter was preventing P.A. from escaping the St. Vincent's building.

56.     Later on January 8, 2010, Toledo left Anderson a message informing Anderson that she had never seen P.A. in such an extreme state of disturbance and urging that P.A. immediately be returned to her care.

57.     Also on January 8, 2010, Anderson left a message for Defendant Rosado, an ACS CP Specialist, to inform Rosado of the events of the supervised visit.

58.     On or about January 11, 2010, Toledo contacted Anderson and reiterated her request that P.A. be returned to her care.

59.     Later on January 11, 2010, Moran informed Anderson once again about P.A.'s repeated demands to return to his home and his rampant and extremely violent and atypical behavior in the foster home.

**P.A. Again Attempts To Escape**

60.     On or about January 19, 2010, while returning with Moran from the Bronx, P.A. attempted to escape from a subway train.  After P.A. heard that the next stop was Brooklyn

11

Bridge, he told J.A. that was where their aunt lived and said "goodbye and I will see you very soon." When the doors opened, P.A. attempted to run off the train, but Moran caught him before he could escape. Moran had to physically restrain him for the remainder of the trip.

61.     On or before January 21, 2010, Moran informed Anderson of the attempted escape on the subway.

**Despite Their Admitted Knowledge of the Need for Immediate Intervention and Evaluation, Defendants Fail To Intervene or Provide the Necessary Care**

62.     In contrast to the immediate action taken to improperly seize P.A. from Toledo's safe and secure home, which involved no emergency whatsoever, Defendants took no action in the face of an obvious emergency the City, acting through ACS, inflicted on P.A.

63.     On or about January 12, 2010, Anderson made inquiries about the need to conduct a psychiatric evaluation of P.A. Anderson was informed that such an evaluation could be conducted at a hospital and that there was no waiting list.

64.     On or about January 13, 2010, Moran informed Anderson of further extreme behavior by P.A., including threatening to kill J.A. Rather than intervening, as was obviously necessary, Anderson repeatedly instructed Moran (who lacked appropriate training) to monitor P.A.'s behavior and determine if it had become so violent or aggressive that he should be taken to a hospital for psychiatric evaluation.

65.     On or about January 14, 2010, P.A. was examined by Dr. Plotnick, a psychologist at St. Vincent's. Dr. Plotnick informed Anderson that P.A. urgently needed a psychiatric evaluation and that P.A. required medication.

66.     After this visit with Dr. Plotnick, Anderson took no further action to obtain a psychiatric evaluation of P.A. or restore P.A. to his family.

67.     On or about January 20, 2010, Anderson received a call from Joshua

12

Levitt, an intern doing intakes at St. Vincent's, to set up an appointment for P.A.'s psychiatric evaluation.  Despite Moran's repeated reports of P.A.'s significant distress and outwardly violent behavior, the admission from Dr. Plotnick that P.A. urgently needed an evaluation and medication, and Anderson's own instruction to Moran that P.A. needed evaluation if his behavior veered toward aggressiveness, Anderson delayed any appointment until January 25, 2010, nearly three weeks after the supervised visit described in paragraphs 50-57, *supra*, and nearly two weeks after Dr. Plotnick advised that P.A. required an urgent evaluation.

**Despite Deeming Family Members Suitable Caregivers and With Full Knowledge of the Condition of P.A. in Foster Care, Defendants Fail to Remove P.A. From Foster Care**

68.     On or about January 6, 2010, a family court hearing was held at which it was to be determined whether custody of P.A. should be granted to Alford, Sr.

69.     Prior to this hearing, Defendant Rosado visited Alford, Sr.'s home to evaluate whether P.A. could be placed into his care and deemed the home suitable.

70.     At the January 6 hearing, upon learning that the Children could be paroled to Alford, Sr., Rodriguez alleged that Alford, Sr.'s live-in girlfriend, Shareema Bruington, had previously abused P.A. and other children.  As a result of this allegation, it was determined that further investigation was necessary before Alford, Sr. could be granted custody of P.A.

71.     On or before January 11, 2010, ACS personnel visited Toledo's home to evaluate whether P.A. could be placed into Toledo's care and deemed Toledo's home suitable as well.

72.     On or about January 12, 2010, Defendant Rosado spoke to the Children, who denied ever having been abused in any way by Bruington and stated that they liked Bruington and that she took good care of them.

73.     On or about January 15, 2010, Rodriguez admitted to Rosado that she had

lied about Bruington's previous abuse and that Rodriguez had been under the influence of drugs at the time she made the allegations.

74.     Despite their knowledge that (i) both the Alford, Sr. and Toledo homes were suitable for P.A., (ii) the removal of P.A. was inappropriate because P.A. had been in no danger, much less imminent danger, and (iii) the forced removal of P.A. from his family and continuing foster placement with Moran had inflicted, and were continuing to inflict, severe emotional distress on P.A., creating an immediate and urgent need of intervention, Defendants failed to take any action to rectify their wrongful conduct.

75.     Defendants failed to remove P.A. from Moran's foster home and failed to allow P.A. to be reunited with his father Alford, Sr. or his aunt Toledo, both of whom had been approved.

76.     With total indifference to P.A.'s constitutional rights, Defendants failed to promptly apprise the court that they knew that there had been no basis to remove P.A. from Toledo's custody, the sworn statement in support of removal was false and a dire emergency now existed requiring immediate removal of P.A. from his foster placement with Moran.

**The Last Chance to Prevent P.A.'s Disappearance – Defendants Again Fail to Act**

77.     On or about January 21, 2010, Anderson visited P.A. at Moran's home. During this visit, P.A. again attempted to escape and needed to be restrained by Anderson and Moran.

78.     During this visit, P.A. attempted to violently cut his arm with a pair of scissors he removed from a knife set.  Moran had to restrain him while Anderson placed the scissors and knife set out of P.A.'s reach.

79.     Throughout the time P.A. was in her care, Moran repeatedly informed

Defendants that P.A.'s violent and distressed behavior was escalating, that he continually attempted to escape, and that caring for him was too difficult for her and caused too much stress.

80.     While the ACS Defendants acted with undue haste to remove P.A. from his aunt's custody, where no danger (immediate or otherwise) existed, Defendants failed to remove him from a situation in foster case that epitomized a dire and desperate emergency that they created.

**P.A. Disappears**

81.     On or about January 22, 2010 at 9:00 p.m., P.A. disappeared from the foster home.  He has not been seen since.

82.     From the time the Defendants improperly seized P.A. up to and including the time of his disappearance, P.A. was continuously in the care and custody of Defendants.

**Notice to the City**

83.     Pursuant to Section 50-e(8) of the N.Y. General Municipal Law, P.A., as an infant ward of the City, is not required to serve upon the City a notice of claim.

84.     In any event, notice of claim was timely filed on P.A.'s behalf by Rodriguez.  More than thirty days have passed since that notice was served upon the City, and the City has either neglected or refused to compromise P.A.'s claims.

85.     As a prudential matter to avoid any possible doubt that all potential claims are properly before the Court, on August 5, 2011, the undersigned counsel served an additional notice of claim upon the City on behalf of P.A.

**First Claim**
**Pursuant to 42 U.S.C. § 1983**
**(Against the City and the ACS Defendants for Violation of**
**P.A.'s Civil Rights by Wrongfully Removing P.A.)**

86.     Plaintiff repeats and realleges paragraphs 1 through 85 as if fully set forth

15

herein.

87.     At the time the City and the ACS Defendants seized P.A., he was in the home, and under the care, of Toledo, his maternal aunt and a suitable caregiver.

88.     At the time of the removal, there was no imminent threat posed to P.A. from remaining in the Toledo home and Toledo consented to his continuing to remain in her care.

89.     Defendants are authorized to seize or keep a child in protective custody without the consent of a parent or guardian only if they have "reasonable cause to believe that the circumstances or condition of the child are such that continuing . . . in the care and custody of the . . . custodian or other person responsible for the child's care presents *an imminent danger to the child's life or health*."  N.Y. Soc. Serv. Law § 417 (McKinney 2010) (emphasis added).

90.     Defendants have a custom and practice of circumventing this statute and unilaterally seizing children from their parent, guardian, custodian or other person responsible for their care without the consent of such person and even though no imminent danger exists with respect to the children's lives or health.  Specifically, Defendants have adopted a custom of seizing children and detaining them away from their families upon learning that a parent of such children is presently unfit to care for a child, regardless of whether such children are under the care and supervision of such parent at that time and without making any determination that such parent creates an imminent danger to the children's lives or health.

91.     Acting pursuant to this custom, despite the lack of any imminent threat whatsoever to P.A.'s health or safety from remaining in Toledo's home or any other emergency, the City and the ACS Defendants unilaterally seized P.A. from the Toledo home without a court order or the consent of Toledo or any other family member.

92.     The City and Mattingly placed ACS personnel in a position to seize

16

children from their families without training them to properly evaluate whether children are in imminent danger before removing children from potentially suitable caregivers. The City and Mattingly also failed to adequately train ACS personnel on the constitutionally-permissible circumstances under which children may be seized without a court order, and the necessity of being candid with, and fully disclosing to, the courts to enable judges to fairly and adequately evaluate the legality of seizing children from their families.

93.    The City and Mattingly failed to supervise ACS personnel's removal of children in such circumstances to ensure children are only removed in compliance with the City and Mattingly's policies. The City and Mattingly also failed to supervise ACS personnel to ensure such removals are not performed without probable cause, without due process of law, or in violation of constitutional rights, or to ensure that adequate disclosure is made to the courts concerning the circumstances of the seizure.

94.    The City and Mattingly knew to a moral certainty (or should have known to a moral certainty) that ACS personnel would confront situations in which judgments must be made when (1) a parent is no longer fit to care for a child; (2) one of such parent's children is not in that parent's care at that time; (3) is instead in the care of another family member or suitable caregiver; and (4) the fitness of that parent poses no immediate threat to the child.

95.    Given the nature of the decisions and judgments being made by ACS personnel, which involve the seizure of children from parents and family members, wrong judgments and decisions resulting from improper training and supervision will inevitably result in the deprivation of constitutional rights. Improperly removing children from suitable caregivers who pose no threat to the children without a court order or other due process of law necessarily deprives such children of their rights under the Fourth and Fourteenth Amendments.

17

96.     Adequate training and supervision would enable better and less difficult judgments and choices to be made by ACS personnel confronting such situations.

97.     The City and Mattingly knew that without proper policies, training, and supervision, ACS personnel would not be able to properly evaluate each case and would remove children from suitable caregivers where removal was unnecessary for such children's safety and/or otherwise impermissible under the Constitution.

98.     By reason of the lack of training and/or supervision, the ACS Defendants wrongly removed P.A. from the custody of Toledo in violation of his constitutional rights under the Fourth and Fourteenth Amendments.

99.     The City and Mattingly's failure to provide adequate training and/or supervision in this regard manifests deliberate indifference to the constitutional rights of citizens and directly and proximately caused the deprivation of P.A.'s constitutional rights.

100.     In light of the conduct alleged, it was not objectively reasonable for the ACS Defendants to believe their actions, which included, without limitation, circumventing established procedures and safeguards, and making false and misleading statements about the imminent danger to P.A. and the availability of less intrusive alternatives, were consistent with law or P.A.'s constitutional rights.

### Second Claim
### Pursuant to 42 U.S.C. § 1983
### (Against All Defendants for Violation of P.A.'s Civil Rights by Failing To Place P.A. With Available Suitable Relatives Instead of Foster Care)

101.     Plaintiff repeats and realleges paragraphs 1 through 100 as if fully set forth herein.

102.     On or about December 29, 2009, the City and the ACS Defendants seized P.A. from Toledo's home without the consent of Toledo, Rodriguez, Alford, Sr., or any other

18

family member, without a court order and in the absence of any emergency or imminent threat to P.A.

103.    Neither the City nor the ACS Defendants contacted Alford, Sr. or otherwise made him aware of the removal prior to seizing P.A. from the Toledo home.

104.    Following the seizure, Defendants immediately forced P.A. into an ACS facility and remanded him to foster care by a complete stranger who lived far away from P.A.'s home and familiar surroundings and who was not fluent in English, which was P.A.'s native language.

105.    Prior to this placement, Defendants made no effort to identify potential placements with suitable relatives and/or family friends, including Alford, Sr. and Toledo.

106.    Both Alford, Sr. and Toledo were suitable caregivers for P.A.

107.    Defendants were legally mandated to "attempt prior to the placement of a child in foster care to locate adequate alternative living arrangements with a relative or family friend which would enable the child to avoid foster care placement."  18 N.Y.C.R.R. 430.10(b)(2).

108.    Defendants have a custom and/or practice of ignoring this regulation and placing children in foster care without first undertaking any effort to determine if there is a suitable relative or family friend available to provide alternative living arrangements.  In fact, in the vast majority of removals, Defendants fail to locate suitable familial resources as an alternative to foster care.

109.    Acting pursuant to this custom and/or practice, the City and the ACS Defendants removed P.A. from the Toledo home, and Defendants ignored that Toledo was a suitable caregiver for P.A.  Acting pursuant to this custom and/or practice, Defendants failed to

make any effort to determine if a suitable relative or family friend was available to provide alternative living arrangements.

110.    The ACS Defendants evaded detection of their wrongful conduct by filing misleading court papers which deliberately conveyed the false impression that P.A. was in imminent danger, needed to be seized immediately and that no safe and suitable alternative to foster care existed.

111.    This custom and/or practice directly and proximately resulted in the deprivation of P.A.'s constitutional rights, including his constitutional right to be cared for by members of his family and not be forced, against his will, to be remanded to foster care by a stranger.

112.    The City and Mattingly also failed to adequately train ACS personnel to attempt to identify a suitable relative or family friend to provide living arrangements as an alternative to foster care prior to forcing a child into the foster care system.

113.    The City and Mattingly do not adequately supervise child protective services personnel to ensure children are not placed in foster care when a suitable relative or family friend is available to provide alternative living arrangements to foster care.

114.    The City and Mattingly knew to a moral certainty (or should have known to a moral certainty) that child protective services personnel would be confronted with situations in which children must be removed from their parent(s) and difficult judgments would need to be made whether to uproot children from their families when family members could provide a suitable alternative to confining children to ACS custody and/or foster care by a stranger.

115.    Adequate training and supervision would enable better and less difficult judgments and choices to be made by child protective services personnel confronting such

20

situations.

116.    The City and Mattingly knew that without proper training and supervision, child protective services personnel would not be able to properly evaluate each case and likely would improperly remove children and place them into foster care, even though suitable alternatives to foster care (such as relatives or family friends) were available, in deprivation of such children's constitutional rights.

117.    By reason of their lack of training and supervision, the City and the ACS Defendants wrongly removed P.A. from the Toledo house, and Defendants placed him in foster care despite the availability of suitable alternatives to foster care, such as Toledo and Alford, Sr., in violation of P.A.'s constitutional rights.

118.    The City and Mattingly's failure to provide adequate training and supervision in this regard manifests deliberate indifference to the constitutional rights of citizens and directly and proximately caused the deprivation of P.A.'s constitutional rights.

119.    In light of the conduct alleged, it was not objectively reasonable for the ACS Defendants and St. Vincent's Defendants to believe their actions, which included, without limitation, circumventing established procedures and safeguards and making false and misleading statements about the imminent danger to P.A. and the availability of less intrusive alternatives, were consistent with law or P.A.'s constitutional rights.

**Third Claim**
**Pursuant to 42 U.S.C. § 1983**
**(Against All Defendants for Violation of P.A.'s Civil Rights by Failing To**
**Remove P.A. from Foster Care Upon Determining Suitable Available Relatives**
**Were Willing to Provide Alternative Living Arrangements to Foster Care)**

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.     Both Alford, Sr. and Toledo expressed to Defendants on numerous occasions their individual requests to have P.A. placed in their care.

122.     Both Alford, Sr. and Toledo were suitable caregivers for P.A.

123.     Defendants investigated both Alford, Sr. and Toledo and found both to be suitable caregivers for P.A.

124.     Even after learning that forcing P.A. into foster care had caused him grave emotional and psychological harm and determining that suitable relatives existed and were willing to care for P.A., Defendants caused P.A. to remain in the foster home for weeks he disappeared.

125.     In or about 2008, the City and Mattingly adopted a policy whereby ACS will not revisit or review foster care placement decisions for a period of at least 20 days after the ICSC (the "20-Day Policy").  Following the expiration of this 20-day period, ACS holds a conference known as the "20-Day Conference."

126.     As a result of the 20-Day Policy, ACS will not remove children from foster care or revisit foster care placement decisions at any time prior to the 20-Day Conference, even if new information arises prior to that time revealing a suitable relative or family friend is available to provide alternative living arrangements to foster care.

127.     Acting pursuant to the 20-Day Policy, despite their knowledge of the extreme harm being caused to P.A. and of suitable available alternatives to foster care for nearly two weeks prior to the scheduled 20-Day Conference, Defendants did not take any action to attempt to remove P.A. from foster care.

128.     P.A. disappeared approximately six days prior to the scheduled 20-Day Conference.

22

129.    Such failure to remove P.A. from foster care upon determining suitable alternatives were available was improper and directly resulted in the deprivation of P.A's rights under the Fourth and Fourteenth Amendments.

130.    Additionally, the City and Mattingly have failed to adopt a policy to promptly remove a child from foster care when a suitable relative or family friend offers to provide alternative living arrangements to foster care.

131.    The City and Mattingly failed to train child protective services personnel to remove children from foster care promptly after a suitable relative or family friend avails himself or herself to provide alternative living arrangements to foster care

132.    Pursuant to their policies, for a period of approximately 20 days following the emergency removal of a child and placement of such child into foster care, the City and Mattingly abdicate all responsibility for supervision of child protective services personnel with respect to such placement.  During this time period, the City and Mattingly do not adequately supervise child protective services personnel to ensure children do not remain in foster care for extended periods of time after a suitable relative or family friend avails himself or herself to provide alternative living arrangements to foster care.

133.    The City and Mattingly knew to a moral certainty (or should have known to a moral certainty) that ACS personnel would be confronted with situations in which suitable relatives or family friends provide alternatives to foster care after a child has already been placed in foster care, and these personnel will have a choice whether to promptly remove the child from foster care or wait until the next scheduled conference and/or court date.

134.    Adequate policies, training and supervision would enable ACS personnel to make better and less difficult judgments and choices whether to promptly remove children

from foster care when suitable family members or friends are located.  Absent adequate policies, training or supervision, constitutional violations are inevitable.

135.    In the present case, Defendants knew that P.A. had previously resided with Alford, Sr. and Toledo, and determined that both Alford, Sr. and Toledo were willing and suitable caregivers.

136.    By reason of the lack of policies, training, and supervision, even though they were well aware of the psychological injury and emotional harm caused to P.A. by his continued confinement in the foster care of Moran, Defendants forced P.A. to remain in Moran's care despite the availability of suitable alternative living arrangements with relatives in deprivation of his rights under the Fourth and Fourteenth Amendments.

137.    The City and Mattingly's failure to adopt adequate policies or training and supervision regimens in this regard manifests deliberate indifference to the constitutional rights of its citizens and directly and proximately caused the deprivation of P.A.'s constitutional rights.

138.    In light of the conduct alleged, it was not objectively reasonable for the ACS Defendants and St. Vincent's Defendants to believe their actions, which included, without limitation, failing to intervene despite their knowledge of the extreme harm being caused to P.A. and the suitable and less intrusive available alternatives to foster care for P.A., were consistent with law or P.A.'s constitutional rights.

**Fourth Claim**
**Pursuant to 42 U.S.C. § 1983**
**(Against All Defendants for Violation of P.A.'s Civil Rights by Placing P.A.**
**With a Foster Parent With Whom He Could Not Communicate)**

139.    Plaintiff repeats and realleges paragraphs 1 through 138 as if fully set forth herein.

140.    Defendants were aware that Moran did not speak fluent English, and that

P.A. only spoke English.  Defendants also knew P.A. had special educational and mental health needs.

141.   Despite this knowledge, Defendants placed P.A. in Moran's care and forced  him to remain in her care until he disappeared.

142.   The City and Mattingly have a policy of not requiring prospective foster parents to speak English as a prerequisite for participation in the foster care program and a policy, custom and/or practice of placing children with foster parents without regard to the primary language spoken by such children or such foster parents.

143.   The City and Mattingly knew, or should have known, that such policies, customs and/or practices, created a substantial risk that foster children would be deprived of their constitutional rights because such children would be confined to situations in which they would be unable to effectively communicate with their foster parents and, thus, would not be able to alert their foster parent when they were in distress or when their needs (including, without limitation, the need for medical attention) were not being met.

144.   These policies, customs and/or practices directly and proximately resulted in the deprivation of P.A.'s constitutional rights.

145.   Alternatively, the City and Mattingly have failed to adopt a policy to ensure language compatibility between foster parents and foster children where at all possible.

146.   The City and Mattingly have failed to train ACS personnel to provide language compatibility between children and foster parents when making placements or to avoid placing children with foster parents with whom the children cannot meaningfully communicate.

147.   The City and Mattingly have failed to supervise the placement of children in foster care to ensure that a child is not placed with a foster parent with whom that child cannot

meaningfully communicate.

148.    The City and Mattingly knew to a moral certainty (or should have known to a moral certainty) that child protective services personnel would encounter situations in which decision would be required whether to force children to be placed with foster parents who are not fluent in the language spoken by the children, given the various languages spoken by residents of the City.

149.    Adequate policies, training and supervision, would enable ACS personnel to make better and less difficult judgments and choices concerning the appropriateness of a prospective placement and to avoid placing a child with a foster parent with whom such child cannot meaningfully communicate.  Absent adequate policies, training or supervision, constitutional violations are inevitable.

150.    The City and Mattingly's lack of policies, training or supervision in this regard manifests deliberate indifference to the constitutional rights of citizens and is the direct and proximate cause of the deprivation of P.A.'s constitutional rights.

151.    By reason of the lack of policies, training or supervision with respect to language compatibility, Defendants deprived P.A. of his constitutional rights by placing him in the care of a foster mother with whom he could not communicate and causing him to remain in that care.

152.    In light of the conduct alleged, it was not objectively reasonable for the ACS Defendants and St. Vincent's Defendants to believe their actions, which included, without limitation, confining P.A. in a foster home where his special needs were not met and he could not effectively communicate with his foster parent (and, thus, could not alert her when he was in distress or when his needs were not being met), were consistent with law or P.A.'s constitutional

rights.

**Fifth Claim**
**Pursuant to 42 U.S.C. § 1983**
**(Against All Defendants for Violation of P.A.'s Civil Rights by**
**Failing To Intervene Despite P.A.'s Extreme Distress)**

153.    Plaintiff repeats and realleges paragraphs 1 through 152 as if fully set forth

herein.

154.    At all relevant times following P.A.'s placement into foster care,

Defendants were aware that he exhibited significant and escalating signs of extreme distress,

including suicidal behavior, violent attacks on others, repeated demands to go home and

innumerable attempts to escape.

155.    Defendants were also aware that a St. Vincent's psychologist examined

P.A. and determined that he urgently needed psychiatric evaluation and medication.

156.    Defendants were also aware that Moran expressed she was incapable of

caring for P.A. because he was "too much" and caused "too much stress."

157.    Despite the foregoing, Defendants failed to remove P.A. from Moran's

care and failed to take him for psychiatric evaluation and treatment.  Such failures constitute

deprivations of P.A.'s rights under the Fourth and Fourteenth Amendments.

158.    Pursuant to 18 N.Y.C.R.R. § 441.15, Defendants are required to provide

"[p]sychiatric, psychological and other essential services . . . appropriate to the needs of the

children in care."

159.    Pursuant to the 20-Day Policy, the City and the Mattingly abdicate all

responsibility for placement supervision for a period of approximately 20 days following the

emergency removal of a child and do not intervene to remove a child from his or her current

foster home when that child exhibits severe signs of extreme distress, including suicidal behavior,

27

violent attacks and/or repeated attempts to escape. Also pursuant to this policy, the City and the ACS Defendants do not provide immediate psychiatric evaluation and treatment for foster children, even after determining such treatment and evaluation is urgently needed.

160.    This policy causes children in foster care to be deprived of their constitutional rights to be protected from harm in the foster home and to receive adequate medical care while in foster care, and directly and proximately resulted in the deprivation of P.A.'s constitutional rights.

161.    Additionally, the City and Mattingly have failed to adopt a policy that child protective services personnel must intervene immediately upon learning that a child in foster care is exhibiting significant distress, such as suicidal behavior, violent attacks on others or repeated attempts to escape. The City and Mattingly have also failed to adopt a policy mandating immediate psychiatric evaluation and treatment of a foster child upon a determination that such measures are urgently necessary.

162.    The City and Mattingly have failed to train child protective services personnel to intervene immediately in such situations and/or to provide immediate psychiatric evaluation and treatment.

163.    The City and Mattingly have failed to adequately supervise the actions of child protective services personnel in such situations to ensure foster children who exhibit signs of extreme distress or are in urgent need of psychiatric care receive the appropriate response. Indeed, the City and Mattingly abdicate all responsibility for placement supervision for a period of approximately 20 days following the emergency removal of a child and thus provide no supervision when it is needed most.

164.    The City and Mattingly knew to a moral certainty (or should have known

28

to a moral certainty) that child protective services personnel would encounter situations in which children removed from their parents and placed in foster care exhibit signs of extreme distress, including suicidal behavior, and may be in need of urgent psychiatric care.

165.    Given the nature of the decisions and judgments being made by child services personnel, which concern protecting children's physical safety and addressing urgent medical needs, wrong judgments and decisions resulting from inadequate policies, training and/or supervision will inevitably result in the deprivation of constitutional rights.

166.    The City and Mattingly knew that without proper policies, training and supervision, child protective services personnel would not be able to properly evaluate each case and respond appropriately to urgent needs of children exhibiting such signs of extreme distress or in need of urgent psychiatric care, in deprivation of such children's constitutional rights.

167.    Adequate training and supervision would enable better and less difficult judgments and choices to be made by Defendants confronting such situations.

168.    By reason of the lack of policies, and their lack of training and supervision, Defendants failed to take prompt action to address P.A.'s severe distress (including suicidal behavior and innumerable attempts to run away) and failed to provide immediate psychiatric evaluation and treatment, in deprivation of P.A.'s constitutional rights.

169.    The City and Mattingly's failure to adopt adequate policies or training and supervision regimens in this regard manifests deliberate indifference to the constitutional rights of its citizens and directly and proximately caused the deprivation of P.A.'s constitutional rights.

170.    In light of the conduct alleged, it was not objectively reasonable for the ACS Defendants and St. Vincent's Defendants to believe their actions, which included, without limitation, failing to intervene and remove P.A. from Moran's care and/or provide immediate

29

medical attention despite their knowledge of the P.A.'s severe distress, suicidal behavior and

urgent need for psychiatric care, were consistent with law or P.A.'s constitutional rights.

**Sixth Claim**
**(Against All Defendants for Violation of**
**Article I, § 6 of the New York Constitution)**

171.    Plaintiff repeats and realleges paragraphs 1 through 170 as if fully set forth

herein.

172.    Article I, section 6 of the New York State Constitution, which prohibits

the deprivation of "life, liberty, or property without due process of law," guarantees to each child

in state custody the substantive right to be free from harm and from undue restraints on their

liberty.

173.    Through their policies, practices, customs, actions or inactions as alleged

above, Defendants have caused Plaintiff to be gravely deprived of his liberty without due process

by, *inter alia,* (i) wrongfully removing him from the Toledo home; (ii) wrongfully failing to

consider relatives and other suitable caregivers prior to placing him in the care of Moran; (iii)

forcing him to be confined with a foster mother with whom he could not communicate; (iv)

wrongfully failing to promptly remove him after learning suitable family members were

available to provide care; and  (v) improperly withholding psychiatric and/or medical care and

wrongfully failing to intervene after he exhibited signs of extreme distress.

174.    Defendants' wrongful removal and unnecessary and prolonged

confinement of Plaintiff at the Moran home despite his extreme distress and urgent need for

medical attention was arbitrary, oppressive, and shocking to the conscience, and manifests

deliberate indifference to Plaintiff's constitutional rights.

175.    Plaintiff has been harmed by Defendants' violations of his rights under

30

Article I, section 6 of the New York State Constitution. Plaintiff's harms include, but are not limited to, deprivation of numerous educational, social, and familial opportunities.  Plaintiff also suffered psychological, emotional and physical damage.

### Seventh Claim
### (Against the City and the ACS Defendants for Negligence in Removing P.A. To Foster Care)

176.    Plaintiff repeats and realleges paragraphs 1 through 175 as if fully set forth herein.

177.    The City and the ACS Defendants knew that P.A. was in the care of Toledo at the time of the removal and that Rodriguez was not a threat to the safety and wellbeing of P.A.

178.    The City and the ACS Defendants had a duty to exercise the highest degree of care in determining whether it was in P.A.'s best interests to be removed from Toledo's care and placed into foster care.

179.    The City and the ACS Defendants failed to exercise this duty by causing P.A. to be immediately removed from Toledo's care without consideration of the necessity of such removal or its impact on P.A.

180.    Such removal of P.A. from the Toledo home in violation of governing law and without a court order, imminent danger to P.A., or consent constitutes reckless and/or grossly negligent behavior on the part of the City and the ACS Defendants.

181.    As a direct and proximate result of the City and the ACS Defendants' failure to exercise their duties of due care, P.A. was harmed.

### Eighth Claim
### (Against All Defendants for Negligence in Failing To
### Place P.A. in the Care of Suitable and Available Relatives)

182.    Plaintiff repeats and realleges paragraphs 1 through 181 as if fully set forth

herein.

183.    Defendants knew that relatives of P.A., including Alford, Sr. and Toledo were willing caregivers and suitable to take care of P.A.

184.    Despite this knowledge, Defendants placed P.A. in Moran's care and caused him to remain in Moran's care until the date of his disappearance.

185.    Defendants had a duty to exercise the highest degree of care in placing P.A. with a suitable caregiver after causing him to be removed from the Toledo house.

186.    By placing P.A. in the care of a stranger rather than with a suitable and willing relative in contravention of 18 N.Y.C.R.R. 430.10(b)(2), Defendants were reckless and/or grossly negligent in failing to exercise this duty.

187.    As a direct and proximate result of Defendants' failure to exercise their duties of due care, P.A. was harmed.

**Ninth Claim**
**(Against All Defendants for Negligence in Placing P.A. With a**
**Foster Parent With Whom He Could Not Communicate)**

188.    Plaintiff repeats and realleges paragraphs 1 through 187 as if fully set forth herein.

189.    Defendants knew that Moran did not speak fluent English and that P.A. only spoke English.  Defendants also knew that P.A. had special educational and mental-health needs.

190.    Despite this knowledge, Defendants placed P.A. in Moran's care.

191.    Defendants had a duty to exercise the highest degree of care in choosing a foster home for P.A.

192.    By disregarding language compatibility issues and placing P.A. with a

32

foster mother with whom he could not meaningfully communicate, despite his special needs, Defendants were reckless and/or grossly negligent in failing to exercise this duty.

193.    As a direct and proximate result of Defendants' failure to exercise their duties of due care, P.A. was harmed.

## Tenth Claim
### (Against All Defendants for Negligence in Failing To Intervene When P.A. Exhibited Significant Distress in the Foster Home)

194.    Plaintiff repeats and realleges paragraphs 1 through 193 as if fully set forth herein.

195.    Defendants knew that P.A. was suffering extreme distress in foster care, including exhibiting signs of suicidal behavior, making violent attacks and making innumerable attempts to run away.

196.    Defendants were also aware that a St. Vincent's psychologist examined P.A. and determined that he urgently needed psychiatric evaluation and treatment.

197.    Defendants also knew that Moran expressed that she was incapable of caring for P.A. because he was "too much" and caused "too much stress."

198.    Defendants had a duty to exercise the highest degree of care in monitoring P.A. while in the foster home.  Moreover, pursuant to 18 N.Y.C.R.R. § 441.15, Defendants have a duty to provide "[p]sychiatric, psychological and other essential services . . . appropriate to the needs of the children in care."

199.    By disregarding the clear signs of extreme distress he exhibited, his urgent need for psychiatric evaluation and care, and Moran's admissions that she could no longer adequately take care of P.A., Defendants were reckless and/or grossly negligent in failing to exercise their duty of due care and their obligations under relevant regulations.

33

200.    As a direct and proximate result of the Defendants' failure to exercise their duties of due care, P.A. was harmed.

**Eleventh Claim**
**(Against the ACS Defendants and St. Vincent's Defendants**
**for Intentional Infliction of Emotional Distress)**

201.    Plaintiff repeats and realleges paragraphs 1 through 200 as if fully set forth herein.

202.    The ACS Defendants and the St. Vincent's Defendants, in the absence of an emergency and without a court order, removed P.A., then a seven-year-old boy, from the care of Toledo, placed him in the faraway home of a stranger with whom he could not meaningfully communicate, and left him there despite his clear distress, violent and atypical behavior, urgent need for medical care, mental health issues and the willingness of relatives to care for him.  This conduct is so outrageous as to be utterly intolerable in a civilized community.

203.    Defendants undertook this conduct with knowledge of, and complete disregard for, the severe emotional distress they were inflicting on P.A.

204.    As a direct and proximate result of Defendants' actions, P.A. suffered severe emotional distress.

**Twelfth Claim**
**(Against all Defendants for Negligent Infliction of Emotional Distress)**

205.    Plaintiff repeats and realleges paragraphs 1 through 204 as if fully set forth herein.

206.    Defendants, in the absence of an emergency and without a court order, removed P.A., then a seven-year-old boy, from the care of Toledo, placed him in the faraway home of a stranger with whom he could not meaningfully communicate, and left him there despite his clear distress, violent and atypical behavior, mental health issues and the willingness

34

of relatives to care for him.  This conduct is so outrageous as to be utterly intolerable in a civilized community.

207.    Defendants had a duty to exercise the highest degree of care in locating a suitable caregiver for P.A. who would be capable of handling P.A.'s needs.

208.    By placing P.A. with a caregiver with whom P.A. could not meaningfully communicate, the Defendants unreasonably endangered P.A.'s physical safety (since P.A. would not be able to alert his primary caregiver to any assistance P.A. might need in order to preserve his well-being), and recklessly and/or grossly negligently failed to exercise their duties.

209.    As a direct and proximate result of Defendants' actions, P.A. suffered severe emotional distress.

### Thirteenth Claim
### (Against the ACS Defendants and St. Vincent's
### Defendants for False Imprisonment)

210.    Plaintiff repeats and realleges paragraphs 1 through 209 as if fully set forth herein.

211.    In wrongly removing P.A. from Toledo's home without probable cause or court order and placing him into foster care, Defendants intended to, and did, unlawfully confine P.A.

212.    P.A. was aware of his confinement, and, indeed, constantly attempted to escape this confinement.

213.    Neither P.A. nor any member of his family consented to P.A.'s confinement.

214.    As a direct and proximate result of Defendants' wrongful removal and intentional confinement of P.A., P.A. suffered harm.

WHEREFORE, Plaintiff demands judgment:

    (a)    awarding compensatory damages in an amount to be determined at trial;

    (b)    awarding punitive damages in an amount to be determined at trial;

    (c)    awarding Plaintiff his costs, disbursements, and attorney fees for this action; and

    (d)    awarding such other and further relief which the Court deems just and proper.

Dated:  August 5, 2011
       New York, New York

          By:    /s/ Jonathan J. Lerner
              Jonathan J. Lerner (jonathan.lerner@skadden.com)
              Robert A. Fumerton(robert.fumerton@skadden.com)
              Patrick G. Rideout (patrick.rideout@skadden.com)
              SKADDEN, ARPS, SLATE,
               MEAGHER & FLOM LLP
              Four Times Square
              New York, New York 10036
              (212) 735-3000

              *Attorneys for Plaintiff P.A., JR.*